IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Shantone Curry, #232668, ) | |
| ) | Civil Action No. 6:07-2933-HFF-WMC |
| Petitioner, ) | |
| ) | **REPORT OF MAGISTRATE JUDGE** |
| vs. ) | |
| ) | |
| Warden, Evans Correctional Institution, ) | |
| ) | |
| Respondent. ) | |
| ) | |

The petitioner, a state prisoner proceeding *pro se*, seeks habeas corpus relief pursuant to Title 28, United States Code, Section 2254.

Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Local Rule 73.02(B)(2)(c), D.S.C., this magistrate judge is authorized to review posttrial petitions for relief and submit findings and recommendations to the District Court.

## BACKGROUND OF THE CASE

The record reveals that the petitioner is currently confined in the South Carolina Department of Corrections pursuant to orders of commitment of the Clerk of Court for Charleston County. The petitioner was indicted for three counts of armed robbery (00-GS-10-0304, 0327 and 99-GS-10-8255). He was represented by attorney John D. Price. The petitioner's co-defendant, Craig C. Ivey, was represented by attorneys Guy J. Vitetta and Leslie Sarji. On September 4-6, 2001, the petitioner proceeded to trial after which he was found guilty of two counts of armed robbery and not guilty on the third count. He was

sentenced by the Honorable Steven H. John to confinement for a period of 17 years for one of the armed robberies and 10 years concurrent on the other.

A timely Notice of Appeal was filed on the petitioner's behalf and an appeal was perfected. In the appeal before the South Carolina Court of Appeals, the petitioner was represented by Tara S. Taggart of the South Carolina Office of Appellate Defense. On November 26, 2002, counsel filed a Final *Anders* Brief of Appellant, asserting as the sole arguable ground "whether the trial judge erred in failing to sever the appellant's trial" from his co-defendant's trial (App. 387). The South Carolina Court of Appeals dismissed the petitioner's appeal. *State v. Curry*, Op. No. 2003-UP-451 (S.C. Ct. App. filed July 1, 2003) (App. 399-400). The petitioner filed a petition for rehearing on July 14, 2003, asserting the same ground as the *Anders* brief and that the trial court erred in failing to grant the motion for a directed verdict. The respondent made a return to the petition for rehearing on July 24, 2003, through Assistant Attorney General Charles Richardson. The South Carolina Court of Appeals denied rehearing on August 21, 2003 (App. 398). The remittitur was entered on October 8, 2003 after certiorari was not sought (App. 397).

The petitioner made an application for post-conviction relief on November 14, 2003. In his application, the petitioner alleged that he was being held in custody unlawfully for the following reasons (verbatim):

> (1)   Ineffective assistance of trial counsel.
> - counsel failed to object to the solicitor's comment at closing.
> - counsel failed to object to damaging testimony.
> - counsel failed to object in a timely fashion.
> - Counsel failed to suppress.
>   - counsel failed to challenge the truthfulness of the warrant affidavit.
>   - counsel failed to challenge evidence used to establish probable cause.
>   - counsel failed to suppress identification testimony of witness/victim.
>   - counsel failed to suppress arrest warrant.

2

>> (2)   Ineffective assistance of appellate counsel.
>
>> (3)   Prosecutorial misconduct.
>> - Prosecution comments inflamed passions of jury.
>> - Prosecution constantly asked jurors to be victims.
>> - Prosecution denied me a fair trial.

(App. 402-03). An evidentiary hearing into the matter was convened on January 20, 2005, at the Charleston County Courthouse (App. 425-470). The petitioner was present at the hearing and was represented by attorney Laura Knobeloch. The respondent was represented by Arie Bax of the South Carolina Attorney General's Office.

At the hearing, the petitioner testified on his own behalf. The court also received testimony from attorney John D. Price. On February 24, 2005, the Honorable Deadra L. Jefferson, Presiding Judge, entered her order of dismissal (App. 472-477).

The petitioner made an appeal to the appellate court from the denial of state post-conviction relief. On October 18, 2005, Assistant Appellate Defender Robert Pachak made a *Johnson* petition for writ of certiorari in the South Carolina Supreme Court asserting as the sole arguable ground:

> ... whether there was any evidence to support the PCR judge's findings that defense counsel was not ineffective in failing to timely object to the solicitor's comments during the closing argument asking the jurors to put themselves in the place of the victims.

*Petition*, p. 2. The petitioner made a *pro se* petition on November 3, 2005, asserting:

> Whether there was any evidence to support the PCR judge's findings that defense counsel was not ineffective and that solicitor's improper comment during closing argument did not effect the outcome of petitioner's trial.

*Pro Se Petition for Writ of Certiorari*, p. 3. The matter was delegated to the South Carolina Court of Appeals. On September 14, 2006, the court issued its order denying certiorari after review pursuant to *Johnson v. State*, 294 S.C. 310, 364 S.E.2d 201 (1988), and granted counsel's request to be relieved. On October 13, 2006, the remittitur was entered.

In his *pro se* petition before this court, the petitioner makes the following allegations (verbatim):

    I.    Motion to Severance Trial.

        A.    App. 74. Attorney Mr. Price who represented defendant Curry asked the court to put Raven Washington's prior statement into evidence. Attorney Mr. Vitetta who represented co-defendant Ivey objected to the request of defendant Curry. App. 125 is the victim Douglas Skeen's testimony. He testifies that Mr. Ivey is the only individual who robbed him. He also testifies that he did not see no one else or any white Honda as said Raven Washington. I did bring this issue up in PCR Court, App. 438. My testimony was overlooked.

    II.    Ineffective Assistance of Trial Counsel.

        A.    App. 63. Co-defendant Ivey plead guilty halfway through the trial. Attorney John Price did not re-address severance motion. App. 317-320. The prosecutor was allowed to make improper statement to the jury numerous of times before being objected. [Petitioner noted that this was not raised on appeal].

    III.    Prosecutorial Misconduct.

        A.    App. 317-320. In her closing statement, prosecutor Amy Harrell asked the jury to place themselves in the shoe of the armed robbery victims.

    IV.    Identification.

        A.    App. 182-201. By his own admission, victim Darrell McCord testified that took place early in the morning while reading his news paper. Facing the north when defendant Curry came from the passenger side which is from the east. His description of the suspects: both black males, 20-25, 6 feet, 175 pounds. Defendant Ivey is 5 foot 9 inches, a little over 200 pounds. Defendant Curry is 6 foot 2 inches, 180 pounds. Mr. McCord also said this robbery happened "real quick."

On January 28, 2008, the respondent filed a motion for summary judgment. By order filed January 29, 2008, pursuant to *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), the petitioner was advised of the summary judgment dismissal procedure and the possible consequences if he failed to adequately respond to the motion. The petitioner filed his response to the motion on February 28, 2008.

## **TRIAL**

The instant case involved a prosecution of the petitioner and his co-defendant, Craig C. Ivey, for three armed robberies that occurred on the morning of July 12, 1999. Each of the three robberies involved two individuals approaching victims and demanding their money. The first robbery involved a handicapped individual who was walking down the street ("street robbery"). The second involved an individual sitting in his car reading a newspaper near a duck pond ("duck pond robbery"). The third robbery involved a victim in his car near a mobile home park ("mobile home park robbery"). Testifying at the trial was another co-defendant, Raven Washington, who claimed to have been an observer to all three robberies (App. 125-301).

After the jury was sworn, the petitioner's counsel asserted that the joint trial of the petitioner with co-defendant Ivey would prejudice the petitioner and erode the presumption of innocence. He urged the court to separate the cases (App. 40-41). Judge Steven John denied the motion, relying upon *State v. Harvey*, *State v. Allen* and *State v. Crow*. He stated that his decision was based upon his review of those cases and that the petitioner had not shown that there would be prejudice to his defense in this matter (App. 41).

The petitioner's counsel also made a motion to have the three armed robberies tried separately. During the *in camera* hearing on this issue, Raven Washington testified about the three robberies and the fact that she was riding in the car with both the

petitioner and Ivey (App. 57). She described the petitioner driving a white Honda, spotting the initial victim and stopping about two blocks away. She described the petitioner directing Ivey to get out and rob the man, and she described Ivey robbing the victim, pointing the gun, and pushing the victim down on the ground. She described the petitioner backing up the car to pick up Ivey. She also testified that Ivey looked through the backpack and realized there was only three or four dollars in it. Washington testified that they used the money for gas.

Washington described the next robbery when they saw a man at the duck pond. This time the petitioner went up to the man with a gun, and the man gave him his wallet and keys. The petitioner looked through the wallet and later threw out the keys (App. 58-59).

According to Washington, at the Parkside Mobile Home Park ("mobile home park robbery"), there was another incident with a man in a green Dodge Caravan. The man was looking for Ivey, and the petitioner was speaking with him and told him "give me your money, I'll go get some crack for you." The petitioner then told Washington he wanted her to have sex with the man for $30, and she did while the petitioner was getting the crack. Thereafter, she gave the petitioner the money. When the petitioner demanded more money, he got upset and went inside the trailer, pulled a gun on the man, and the petitioner took his keys (App. 60). They then panicked and left. She stated that they went to the Catalina Motel and got a room, and the petitioner left. She stated that she felt they were robbing these people just to do it (App. 61).

Counsel for Ivey initially cross-examined Washington. She admitted that in her written statement to the police she did not name Ivey as being present at the incident when she had sex with the man at the trailer park (App. 63). However, she admitted that she stayed at the motel later with Ivey. She admitted that she could see Ivey take the backpack and necklace. She also stated that she was correct when she gave her

6

statement five days after the incident that the trailer park was the first incident to happen and afterward they went to the Catalina Inn (App. 63-64). She also stated that the petitioner never returned to the motel that night after he had left. She clarified that it was the next day that they were riding around in the white Honda. She confirmed it was the next day that they saw the man on crutches, dropped off Ivey, saw him pull out a gun and take the necklace and backpack, and afterward went to the duck pond where the petitioner had gotten out and pointed the gun at another man (App. 65). She recalled saying to the police that Ivey had gotten out first and the petitioner got out when it was "not working" for Ivey. She recalled only that there were robberies and that she was there (App. 66). She testified she did the "trick" because there was a gun and she felt threatened (App. 67).

On cross-examination from the petitioner's counsel, Washington admitted that in her statement she stated that the mobile home park incident happened and then they stayed overnight at the Catalina Inn, and the next day they robbed the man on crutches and the man at the duck pond. She admitted that she was drinking alcohol at the Catalina, but not using drugs, and they had used the stolen money for gas, food, "weed and for beer" (App. 69). She admitted that alcohol could affect one's memory. She confirmed that she did not tell the police at the time of her statement about having sex with the man. She stated that she was not charged with prostitution, but she had been charged with conspiracy to commit armed robbery. She had not yet been sentenced (App. 70-71).

On redirect by the solicitor, Washington stated it was possible all three robberies happened on the same day. Washington stated that there was no doubt in her mind that all three were together during the robberies (App. 73). On re-cross by Ivey's counsel, she stated that she did not see the petitioner come back until the day after she stayed at the Catalina (App. 73). The trial judge denied the motion to try the three counts of armed robbery separately (App. 810).

At trial, Doug Skeens testified that on July 12, 1999, he walked to eat breakfast at the Bi-Lo. He was carrying a backpack (App. 126). While he was walking, the "gentleman in the white shirt" [Craig Ivey] came up to him and was tugging at Skeens' pants trying to get his wallet. Skeens said he turned and saw Ivey lift up his shirt and show a gun in his waistband. Ivey took his wallet and his backpack (App. 127). Skeens described the gun as appearing rusty. He said after the perpetrator went up a side street, he did not see him again. He said he called 911 and the police arrived. Skeens said he had $5 in his wallet and, with the change in his backpack, it was less than $10.00 (App. 129). He said he later viewed a lineup and picked out a suspect who was Ivey (App. 129-30, 133). He stated that he did not see anyone else that date (App. 131).

On cross-examination by Ivey's counsel, Skeens confirmed that the lineup was about 10 days after the incident (App. 135). He said he was not aware at the time that Washington had named Ivey prior to that photo lineup (App. 135). No cross-examination was done by the petitioner's counsel (App. 137).

During the trial, out of the jury's presence, Ivey entered an *Alford* guilty plea to the Doug Skeens (the street robbery) and duck pond robberies and was sentenced (App. 163-79). Initially, as a part of the negotiation, the state agreed to *nol pros* a number of other charges "but that is contingent upon him not taking the stand in this particular case and throwing himself on the sword for his buddy. In other words, if he intends to take the stand in this case, testify, say I did all of this, this other guy didn't have anything to do with it, I want it clear on the record the deal is off and we're free to prosecute him on the remaining indictments" (App. 177). Ivey and his counsel agreed (App. 177-78). After the jury returned after the plea, the jury was advised that Ivey and his counsel were no longer present. The jury was advised that "they are no longer involved in this matter. You may not take any type of inference from that. You may not consider that in any way" (App. 180).

8

Subsequent to the plea, the duck pond robbery victim testified. He testified that on July 12, 1999, while he was sitting in his car reading his newspaper, he saw the white Honda come around three times. He stated that the car pulled up behind him, and Ivey got out first. Ivey came around to the driver's side, pulled out a pistol, and asked him to give him what he had, which he did (App. 184). He described the petitioner getting out of the Honda, coming over to his car, and taking the keys out of his car. Ivey and the petitioner then drove off in their car with his keys, but they then threw them into the street (App. 184). He stated that they took $50 and his pager from him, as well as the keys (App. 187). The witness identified the petitioner as one of the robbers (App. 187). He stated he saw the petitioner, Ivey, and Washington in the car (App. 189). He also confirmed that he identified the petitioner in a photo lineup (App. 192 -93).

Another alleged victim testified about an armed robbery that also occurred on July 12 (mobile home robbery) (App. 228-29). He stated that when he pulled into a driveway to turn around to get gas for his car, he saw a person motion to him, and he asked him what he wanted. The man then pulled a gun on him and pointed it at his head (App. 229, 236-237). He said he got out of his car and went to an apartment, and a girl came out. He said the man searched his pockets, and the girl searched his car, and they took his money. He said that he saw them look back and see another man who was walking up, and then all three them left after they took his car keys (App. 229-30). The victim said they searched his pockets and took about $30 and his wallet as well as the keys (App. 238-39). He testified that he ran to the Hot Spot to call the police, but flagged down a North Charleston police car as he crossed the street (App. 230). He identified the petitioner as the person who had the gun (App. 234). On cross-examination, he denied having sex with Raven Washington and denied giving her any money (App. 244-45).

Raven Washington testified as a witness for the State. She stated that she, the petitioner, and Ivey were riding around and the petitioner spotted the handicapped man

9

walking on crutches. The petitioner asked which one was going to get the man, and Ivey said he would do it (App. 280). They dropped Ivey off a block ahead of the man. She said they rode back so they could see everything that was going on. She saw Ivey point the gun at the man and take his necklace and backpack and knock the man to the ground. Ivey then ran back to the car and got in the backseat, and then they took off with the petitioner driving (App. 280-81). Washington said the gun was either a 357 or a 380. She recalled it appeared rusty with a black and tan handle. It was not her gun, but she thought it was either the petitioner's or Ivey's, and they kept passing it to each other during the robberies. She said the petitioner had the gun when they saw the victim and then gave it to Ivey. She said three to four dollars was taken because they went and bought gas with it at the Hot Spot (App. 282-83).

Concerning the "duck pond" robbery, Washington said there was a man reading a newspaper in a burgundy car, and the petitioner pulled up and blocked the man in so he could not drive away (App. 283-84). Ivey was in the backseat and pointed the gun at the man and demanded money. At that point, the petitioner got out of the car, took the gun from Ivey, and the man gave the petitioner money. She said the petitioner then took his car keys and they drove off. She said the petitioner then went back and threw his keys and told the victim to look for them (App. 284). She stayed in the car and said she did not know how much money was taken (App. 284-85).

At the Parkside Mobile Home incident, Washington testified there was a man looking for crack cocaine. Ivey told the petitioner the man wanted "some dope," and the petitioner told the man to give him money and he would get it for him (App. 285). The man gave the petitioner money. Before the petitioner left, he told Washington that he wanted her to have sex with the man for $30. She said she went inside the trailer and had sex with the man, and when she came outside the petitioner was there, and she gave him the money. However, the petitioner was mad about it and thought he would have given more

10

money because the man had a nice van and "white guys were supposed to have money" (App. 285). She testified the petitioner then went inside the trailer, pointed the gun at the man and demanded more money. She said that when the petitioner had the man's keys in his hand and was trying to get into the man's van, she saw an elderly lady upstairs who asked them what was going on (App. 287). She said they got scared and took off at that point. She said the petitioner kept saying he had to keep getting dope ("crack cocaine") (App. 288).

Washington testified that all the incidents had occurred "back to back." She recalled giving a statement to Officer Perry a couple of days after the robberies (App. 289-90). She said that she was charged with conspiracy to commit armed robbery and was in jail for it (App. 290). She said no promises had been made for it and she had to be sentenced for it (App. 290).

On cross-examination, it was pointed that she had not been sentenced and was charged only with conspiracy and not armed robbery (App. 291). She admitted that she "turned a trick on Mr. Johnson" (App. 292). She affirmed that Johnson (the alleged victim of the mobile home robbery) had come into the Hot Spot minutes before and that they had a discussion that he was looking for drugs. She confirmed he was told to go down to the trailer park area. She also confirmed that they met him in that spot and that she got $30 for the trick. She said she gave a statement and that she believed the incidents occurred on one day, but did not recall which happened first (App. 293-94). After her testimony, the State rested (App. 301).

The jury convicted the petitioner of armed robbery on the indictments for the street and duck pond robberies and found him not guilty of the mobile home park robbery (App. 363). The defense moved for a new trial based upon "previous motions" and insufficient evidence. The court denied the motions (App. 367).

**APPLICABLE LAW**

Title 28, United States Code, Section 2254(d) and (e) provides in pertinent part as follows:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.
>
> (e)(1) In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

**ANALYSIS**

*Ground One*

In his first ground for relief, the petitioner alleges the trial court erred in failing to grant his motion for severance of his trial from that of his co-defendant Ivey. Generally, motions for severance are matters addressed to the discretion of the trial judge. *Opper v. U.S.*, 348 U.S. 84, 95 (1954); *State v. Dennis*, 523 S.E.2d 173, 176 (S.C. 1999); *State v. Stuckey*, 556 S.E.2d 403, 409 (S.C. Ct. App. 2001). As stated in *Stuckey*, "A severance should be granted only when there is a serious risk that a joint trial would compromise a specific trial right of a co-defendant or prevent the jury from making a reliable judgment about a co-defendant's guilt." 556 S.E.2d at 409. Criminal defendants who are charged

with the same crime are not entitled to separate trials as a matter of right. *State v. Nichols*, 481 S.E.2d 118, 122 (S.C. 1997). Consolidated prosecutions "conserve state funds, diminish inconvenience to witnesses and public authorities, and avoid delays in bringing those accused of crime to trial." *Bruton v. U.S.*, 391 U.S. 123, 134 (1968). As the Fourth Circuit Court of Appeals has stated:

> The Supreme Court has indicated that "[t]here is a preference in the federal system for joint trials of defendants who are indicted together." *Zafiro v. United States*, 506 U.S. 534, 537, (1993). Accordingly, severance under Rule 14 is only warranted when "there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro*, 506 U.S. at 539. The defendant must "establish that actual prejudice would result from a joint trial, ... and not merely that a separate trial would offer a better chance of acquittal." *United States v. Reavis*, 48 F.3d 763, 767 (4th Cir.1995).

*U.S. v. Najjar*, 300 F.3d 466, 473 (4th Cir. 2002) (parallel citations omitted). "'[T]he mere presence of hostility among defendants ... or a desire of one to exculpate himself by inculpating another [are] insufficient grounds to require separate trials.'" *Id.* at 474 (quoting *U.S. v. Spitler*, 800 F.2d 1267, 1271 (4th Cir. 1986)). The court further stated, "There must be such a stark contrast presented by the defenses that the jury is presented with the proposition that to believe the core of one defense it must disbelieve the core of the other . . ., or 'that the jury will unjustifiably infer that this conflict alone demonstrates that both are guilty.'" *Id.* (internal citations omitted).

As set forth above, the charges against the petitioner and Ivey were the same and the facts were interconnected. The petitioner has failed to enumerate any specific instances of substance where his co-defendant's presence at the joint trial hindered his defense. To warrant a separate trial, the petitioner has to establish that he was prejudiced by the joint trial. The fact that there was a departure of the petitioner's co-defendant during the trial when that co-defendant entered guilty pleas was not inherently prejudicial to the

petitioner. *See State v. Rutledge*, 198 S.E.2d 250, 251-52 (S.C. 1973) ("The prejudice of which appellant complains was simply inherent in the facts of the case and not in the joint trial.").

In his present petition, the petitioner contends that he subsequently satisfied his burden and specifically refers to the *in camera* testimony of accomplice Raven Washington (App. 74) and the trial testimony of victim Douglas Skeens. However, as argued by the respondent, the testimony of Washington supported joinder, not separation, of the cases because she stated all three were involved and present at the incidents. Based upon the foregoing, the claim fails.

***Ground Two***

The petitioner alleges that he received ineffective assistance of counsel because his counsel did not re-address the severance issue after the guilty plea of his co-defendant. This claim is procedurally barred. If a petitioner before a federal district court fails to raise a claim in state court and is precluded by state rules from returning to state court to raise the issue, he has procedurally bypassed his opportunity for relief in state courts. In such a case, a federal district court is barred from considering the habeas claim absent a showing of cause and actual prejudice or that failure to consider the claim will result in a fundamental miscarriage of justice, as the exhaustion requirement is technically met and the rules of procedural bar apply. *Matthews v. Evatt*, 105 F.3d 907, 916 (4th Cir. 1997) (citing *Coleman v. Thompson*, 501 U.S. 722, 750 (1991)). A petitioner may establish a fundamental miscarriage of justice by showing that a constitutional error probably resulted in the conviction of one who is actually innocent. In order to raise a claim of actual innocence, a prisoner "must present evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error." *Schlup v. Delo*, 513 U.S. 298, 316 (1995).

The petitioner did not raise this ground in the PCR application, nor was it raised at the hearing. He was represented at the PCR hearing by counsel, who chose not to properly raise this issue and to have it ruled upon in the court's order by a Rule 59(e) motion. The petitioner cannot show actual innocence because the evidence against him, which is described above, is overwhelming. Accordingly, this issue is procedurally barred.

The petitioner next argues that he received ineffective assistance of counsel because his trial counsel failed to timely object to the prosecutor asking the jurors to put themselves in the place of the victims.[1] This ground was raised to and addressed by the PCR court.

Claims of ineffective assistance of counsel are governed by the two-part test established in *Strickland v. Washington*, 466 U.S. 668 (1984). First, the petitioner "must show that counsel's performance was deficient." *Id.* at 687. To prove deficiency, the petitioner "must show that counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. Second, the petitioner must show that the deficient performance actually prejudiced him, *i.e.* "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. Finally, the Court in *Strickland* held that "a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies," and "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Id.* at 697. Review of counsel's performance is "highly deferential." *Id.* at 689.

---

[1] For example, with regard to the first victim, the prosecutor asked, "Can you put yourselves in the shoes of a person walking down the street?" (App. 318). With regard to the second victim, the prosecutor asked, "Can you imagine [the defendants] coming up to you, putting a gun on you, taking your money?" (App. 318). With regard to the third victim, the prosecutor asked, "Can you imagine being [the third victim]? Can you imagine being on Remount Road and pulling in and having a gun put to your head?" (App. 320).

15

The PCR court found as follows:

At the hearing on this matter, the Applicant alleged Counsel was ineffective for failing to timely object to the solicitor's comments during closing arguments to the effect that the jurors should put themselves in the place of the three victims. Specifically, the Applicant complained that Counsel failed to object to the solicitor's suggestion until the solicitor made reference to the third and final victim. The Applicant alleged that by the time Counsel did object to the solicitor's comments in" reference to the third victim, the "damage had already been done." The Applicant also alleged Counsel failed to adequately attempt to suppress identification testimony offered during the trial.

Counsel testified as to his strategic reasons for not objecting to some of the solicitor's comment's during closing arguments. As regards the first victim, Counsel testified he did not object to the solicitor's comments because the victim was disabled and the solicitor sounded as if she was taking a "cheap shot" in using such terminology as "the handicapped guy," and "crippled people have money." As to the second victim, Counsel testified that the solicitor's comments reiterated that the victim was caught unawares during the robbery, which was in line with the defense theory that the Applicant had been misidentified as a participant in the offenses. During the solicitor's argument as to the third and final victim, Counsel did in fact enter an objection. The trial judge sustained the objection and gave the jury a curative instruction, admonishing the jurors that they should "completely and totally disregard" the solicitor's argument that they should place themselves in the place of a victim. An additional curative instruction was also given during the court charge. (Tr. p. 343).

This Court finds the Applicant has failed to establish either deficiency on the part of counsel in failing to object to the solicitor's comments during closing arguments or prejudice resulting from any alleged deficiency in this regard. Our courts are understandably wary of second-guessing defense counsel's trial tactics. Where counsel articulates valid reasons for employing a certain strategy, counsel's choice of tactics will not be deemed ineffective assistance. *Whitehead v. State*, 308 S.C. 119, 417 S.E.2d 530 (1992). Counsel articulated valid strategic reasons for declining to object to the solicitor's comments with respect to the first two victims. The Applicant has not shown that counsel was deficient in that choice of tactics. Moreover, Counsel did object to the solicitor's suggestion that the juror's place themselves in the victims'

> place at the point in closing arguments when Counsel deemed it necessary and prudent to do so. Not only was Counsel's objection sustained, but the Court issued a stern curative instruction that, in effect, allowed the Applicant the benefit of Counsel's trial strategy in not objecting earlier while simultaneously curing any negative impact the solicitor's comments may have had. The allegation is, therefore, denied and dismissed.

(App. 474-76).

The petitioner's counsel objected during the solicitor's argument "asking [the jury] to put themselves in their place" (App. 320). As noted by the PCR court, the petitioner's counsel testified as to his strategic reasons for not objecting to the prosecutor's comments as to the first two victims and his reasons for objecting as to the third victim. The trial court gave a curative instruction directing the jury to "completely and totally disregard those arguments by the Solicitor." In the final instructions, the court again advised the jury it was an "improper argument" and "you may not consider them for any purpose in your deliberations" and that they were to be governed by the evidence (App. 343). As noted by the PCR court, the petitioner had the benefit of his counsel's trial strategy[2] as to the first two victims, while also getting a curative instruction from the judge. Further, the jury acquitted the petitioner of one of the robberies. Counsel testified that the curative instruction "was . . . very strong toned," and the jury was aware that the prosecution had violated a rule of closing argument and the instruction made all the impact that counsel felt he could ask for (App. 451-52). Based upon the foregoing, the petitioner failed to establish that his trial counsel's performance was deficient and that but for his counsel's unprofessional errors, he would have been acquitted of the two robberies. The state court's decision was neither contrary to nor an unreasonable application of Supreme Court precedent. Further, the state

---

[2]The petitioner's trial counsel testified that he thought the prosecutor's comment with regard to the first victim, who was handicapped, "came across as just cheap," so he chose not to object (App. 449). With regard to the second victim, he felt that it did not hurt the petitioner's case, because it fit into his theory that the victim did not have an opportunity to observe the petitioner (App. 449-51).

17

court's decision was based upon a reasonable determination of the facts before it. Accordingly, this claim fails.

***Ground Three***

In his third ground for relief, the petitioner alleges prosecutorial misconduct in that the prosecutor, in her closing argument, asked the jury to put themselves in the place of the victims. As discussed above, the petitioner's counsel objected, and the trial court gave a curative instruction. This issue was not raised by the petitioner on direct appeal. The petitioner raised the issue in his PCR application; however, when the issue was raised in the PCR hearing, it was presented and ruled upon in the context of an ineffective assistance of counsel claim, not as a due process claim. Nonetheless, the claim fails on the merits. The relevant question in analyzing a claim for prosecutorial misconduct on habeas review is "whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright,* 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo,* 416 U.S. 637, 643 (1974)). To satisfy this standard, the conduct must be both improper and flagrant. *Broom v. Mitchell,* 441 F.3d 392, 412 (6th Cir.2006) (citing *Bates v. Bell,* 402 F.3d 635, 641 (6th Cir.)). Conduct is improper if made "to incite the passions and prejudices of the jurors...." *United States v. Solivan,* 937 F.2d 1146, 1151 (6th Cir.1991). If conduct is found to be improper, four factors are then considered to determine flagrancy: "(1) the likelihood that the remarks of the prosecutor tended to mislead the jury or prejudice the defendant; (2) whether the remarks were isolated or extensive; (3) whether the remarks were deliberately or accidentally made; and (4) the total strength of the evidence against the defendant." *Bates,* 402 F.3d. at 641.

Here, it is unlikely that the remarks of the prosecutor tended to mislead the jury or prejudice the petitioner as the petitioner was found not guilty of one of the robberies. The evidence against the petitioner was very strong on the two robberies for which he was

found guilty. Further, the trial court gave a curative instruction admonishing the jurors that they should "completely and totally disregard" the solicitor's argument that they should place themselves in the place of a victim. An additional curative instruction was also given during the court charge. Based upon the foregoing, the petitioner has failed to show that the prosecutor's comments so infected the trial with unfairness as to make the resulting conviction a denial of due process. Accordingly, the claim fails.

*Ground Four*

In his final ground for relief, the petitioner contends that there was error in the victim's identification of him as the robber in the duck pond robbery. The victim testified about the incident and identified the petitioner (App. 181-205). He had also identified the petitioner earlier in a photographic lineup (App. 191-93). No objection was made at trial to the victim's identification of the petitioner (App. 191-94). Accordingly, this claim is barred under the contemporaneous objection doctrine of *Wainwright v. Sykes*, 433 U.S. 72, 90-91 (1977) (holding that petitioner's failure to make timely objection to the admission of his inculpatory statements, absent a showing of cause for the noncompliance and some showing of actual prejudice, bars federal habeas corpus review of his *Miranda* claim). To be preserved, such a freestanding claim would have to have been asserted at the trial level and then raised to the state supreme court on direct appeal, which was not done in this case. *See Drayton v. Evatt*, 430 S.E.2d 517, 519 (S.C.1993) (issues that could have been raised at trial or on direct appeal can not be raised in a PCR application absent a claim of ineffective assistance of counsel). As discussed above, if a petitioner before a federal district court fails to raise a claim in state court and is precluded by state rules from returning to state court to raise the issue, he has procedurally bypassed his opportunity for relief in state courts. In such a case, a federal district court is barred from considering the habeas claim absent a showing of cause and actual prejudice or that failure to consider the

claim will result in a fundamental miscarriage of justice, as the exhaustion requirement is technically met and the rules of procedural bar apply. *Matthews v. Evatt*, 105 F.3d 907, 916 (4th Cir. 1997) (citing *Coleman v. Thompson*, 501 U.S. 722, 750 (1991)). The petitioner has failed to show cause and actual prejudice, and he cannot show actual innocence because the evidence against him is overwhelming. Accordingly, this issue is procedurally barred.

### CONCLUSION AND RECOMMENDATION

Wherefore, based upon the foregoing, it is recommended that the respondent's motion for summary judgment be granted.

s/William M. Catoe
United States Magistrate Judge

July 24, 2008

Greenville, South Carolina